[No. H029138. Sixth Dist. June 12, 2007.]

KIM SISEMORE et al., Plaintiffs and Appellants, v.
MASTER FINANCIAL, INC., et al., Defendants and Respondents.

1390

COUNSEL

Fair Housing Law Project, Kerstin Arusha and Moses Diaz for Plaintiff and Appellant Kim Sisemore.

Brancart & Brancart, Christopher Brancart and Elizabeth Brancart for Plaintiff and Appellant Project Sentinel, Inc.

Law Offices of David Sturgeon-Garcia and David Sturgeon-Garcia for Defendants and Respondents.

## OPINION

**DUFFY, J.**—We address here whether a licensed family daycare home operator who allegedly suffered discrimination in applying for a home loan may state a legally cognizable claim for discrimination under the Fair Employment and Housing Act (FEHA), Government Code section 12955 et seq.[1] The daycare home operator claims, inter alia, that the lender's action violated FEHA because it (1) constituted intentional discrimination on the basis of the borrower's source of income, and (2) had the effect of discriminating against women and families with children.

Plaintiff and appellant Kim Sisemore (Sisemore), the mother of a young child, is a licensed operator of a family daycare home. She sought a mortgage loan from defendant and respondent Master Financial, Inc. (Master Financial), to facilitate her purchase of a San Jose home. She was turned down; Master Financial stated in writing that it "does not lend on day care homes." Shortly thereafter, plaintiff and appellant Project Sentinel, Inc., a nonprofit fair housing organization (Project Sentinel), obtained written confirmation from Master Financial that it "will NOT make loans with home day care if the home day care income is required to qualify."

Sisemore brought suit against Master Financial and two of its employees; Project Sentinel later joined in the suit as a plaintiff.[2] They contended, among other things, that Master Financial's policies were in violation of FEHA. More specifically, plaintiffs asserted that Master Financial (1) had intentionally discriminated on the basis of the source of income of the loan applicant in violation of section 12955, subdivision (e); and (2) was liable under FEHA because its lending policy had a disparate impact on Sisemore and other family daycare home operators in that it disproportionately excluded women and families with children, thereby violating sections 12955, subdivision (e), and 12955.8, subdivision (b). The demurrer to the second amended complaint (Complaint) was sustained without leave to amend by the court below, and plaintiffs appeal from a judgment that we deem to have been entered on that order. (See Discussion, pt. II., *post.*)

We consider on appeal whether a source-of-income discrimination claim under FEHA applies only in the landlord-tenant context (as the court concluded below). We also consider whether plaintiffs' disparate impact claim is viable, or, as Master Financial urges, is not maintainable because family daycare home operators are not among a class of persons protected under FEHA. Further, we evaluate the viability of Sisemore's claims of discrimination under the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), of unlawful

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] Sisemore and Project Sentinel are hereinafter sometimes collectively referred to as plaintiffs.

or unfair business practice under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and of violating Health and Safety Code section 1597.40. We also consider whether Project Sentinel had standing to allege a FEHA claim.

■ We conclude after de novo review that the lower court properly sustained without leave to amend the demurrer to the first cause of action for violation of Health and Safety Code section 1597.40. The court, however, erred when it sustained the demurrer to the fourth cause of action for violation of the Unruh Civil Rights Act. Further, the court should have overruled the demurrer to the (FEHA) third cause of action. Plaintiffs have stated a claim for intentional source-of-income discrimination under FEHA; section 12955, subdivision (e) cannot be read so narrowly as to make it applicable only to tenants or potential tenants seeking rental housing. Plaintiffs have further stated a FEHA claim for disparate impact discrimination. Moreover, we hold that Project Sentinel alleged sufficient facts for standing to assert a FEHA claim. Finally, we conclude that Sisemore has stated a viable claim under the UCL (second cause of action). Accordingly, we will reverse.

## FACTUAL BACKGROUND

The following material facts—which this court accepts as true for purposes of evaluating the trial court's ruling on demurrer (*Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1330, fn. 1 [126 Cal.Rptr.2d 231])—are alleged in the Complaint: Sisemore is a licensed operator of a family daycare home for 14 or fewer children. The principal source of her income is from her operation of the family daycare home. Sisemore has custody and care of her three-year-old daughter.

In June 2003, Sisemore—while she was renting the home out of which she operated her daycare business—contacted Nikki Caster, a loan processor, to assist in obtaining a loan to purchase a home. Caster in turn contacted Colleen Brehm, a representative of Master Financial; she explained Sisemore's financial circumstances to Brehm, including the fact that Sisemore was then renting a home and that the principal source of her income was the operation of a daycare home. Brehm informed Caster that Sisemore could qualify for a particular loan product that Master Financial offered. That product consisted of a loan secured by a first deed of trust at an interest rate starting at 5.24 percent, and a loan secured by a second deed of trust at an interest rate starting at 9.99 percent. Brehm did not tell Caster or Sisemore that a term of the home loan prohibited Sisemore from using her intended home as a family daycare operation.

In August 2003, Sisemore located a home in San Jose that she wanted to purchase; she intended to reside in it with her daughter, and to operate a daycare business. Caster informed Brehm about the property. Brehm told Caster that the interest rate on the first loan had increased to 5.74 percent but that the terms were otherwise the same as previously discussed. Based upon this understanding, Sisemore submitted an offer to purchase the home that was accepted. During the escrow process, Master Financial sent a letter denying Sisemore's loan application, stating that it "does not lend on day care homes." As a result of this denial, Sisemore was required to seek and obtain an alternative home loan with less attractive rates and terms than the loans she had anticipated receiving from Master Financial.

In July 2004, a female Project Sentinel employee, who posed as a licensed home daycare operator (a "tester"), contacted Master Financial to inquire about qualifying for a home loan. Andy Vargas, an area sales manager of Master Financial, advised her by e-mail that Master Financial "will NOT make loans with home day care if the home day care income is required to qualify."

## PROCEDURAL BACKGROUND

Sisemore filed her original complaint on August 20, 2004, against Master Financial, Vargas, and Brehm. Thereafter, Sisemore, along with Project Sentinel, filed a first amended complaint. Master Financial filed a demurrer and motion to strike relative to the first amended complaint.[3] The court in large part sustained the demurrer with leave to amend.

Sisemore and Project Sentinel filed the Complaint on or about March 24, 2005. Master Financial filed a demurrer and motion to strike. The court sustained without leave to amend the demurrer to the first through fourth causes of action of the Complaint.[4] Sisemore and Project Sentinel filed separate timely appeals from the order.[5]

---

[3] The original complaint apparently named both Vargas and Brehm as individual defendants. It is apparent that Brehm was not named in the first amended complaint, and she was not named as a defendant in the Complaint that we consider in this appeal. Although Vargas joined in the demurrers and is a respondent in the instant appeal, there are no separate allegations involving him. Therefore, acknowledging that Vargas is a nominal party to this action, for simplicity we shall refer to plaintiffs' claims in the Complaint as being alleged against Master Financial.

[4] Further particulars concerning the court's order are discussed, *post.*

[5] Project Sentinel indicated in its notice of appeal that it was appealing a judgment of dismissal following an order sustaining a demurrer. Sisemore stated in her notice that she was appealing from "the judgment or order in this case, which was entered on June 20, 2005, sustaining defendants' demurrer without leave to amend." There was in fact no judgment or dismissal entered in this case. We address the issue of appealability, *post.*

## DISCUSSION

### I. *Issues on Appeal*

The following issues are presented in this appeal:

1. Whether Master Financial's alleged policies constituted a prohibition or restriction on the use or occupancy of property as a family daycare home, such that Sisemore stated a claim for a violation of Health and Safety Code section 1597.40.

2. Whether Sisemore stated a cause of action for violation of the Unruh Civil Rights Act (Civ. Code, § 51).

3. Whether plaintiffs stated a claim for intentional discrimination based upon source of income under FEHA (§ 12955 et seq.).

4. Whether plaintiffs stated a claim for disparate impact discrimination under FEHA, because Master Financial's policies had a disproportionate effect on women or families with children.

5. Whether Project Sentinel alleged sufficient facts for standing to assert a FEHA claim.

6. Whether Sisemore stated a cause of action under the UCL (Bus. & Prof. Code, § 17200).

### II. *Appealability*

We are confronted initially with whether the matter from which the appeals have been taken is properly appealable. Although Master Financial here does not argue that plaintiffs' separate appeals are defective because they challenge a nonappealable order, we cannot overlook this potential procedural infirmity: "The existence of an appealable judgment is a jurisdictional prerequisite to an appeal. A reviewing court must raise the issue on its own initiative whenever a doubt exists as to whether the trial court has entered a final judgment or other order or judgment made appealable by Code of Civil Procedure section 904.1. [Citations.]" (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 126–127 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) Since this issue is central to our jurisdiction, we address it on our own motion. (*Olson v. Cory* (1983) 35 Cal.3d 390, 398 [197 Cal.Rptr. 843, 673 P.2d 720]; *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 436 [129 Cal.Rptr.2d 436].)

 The purported appeals taken by plaintiffs were from the order sustaining the demurrer. The record does not reflect the entry of a judgment or a dismissal on the demurrer order. An order sustaining a demurrer without leave to amend is not appealable, and an appeal is proper only after entry of a dismissal on such an order. (*Berri v. Superior Court* (1955) 43 Cal.2d 856, 860 [279 P.2d 8]; *Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1695 [40 Cal.Rptr.2d 125].) On occasion, however, appellate courts have reviewed such orders, based upon justifications such as the avoidance of delay, the interests of justice, and the apparent intent of the trial court to have a formal judgment filed. (*Reyna v. City and County of San Francisco* (1977) 69 Cal.App.3d 876, 879 [138 Cal.Rptr. 504].) And when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment. (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098 [95 Cal.Rptr.2d 779]; see also *Hinman v. Department of Personnel Admin.* (1985) 167 Cal.App.3d 516, 520 [213 Cal.Rptr. 410] [appeal from order sustaining demurrer without leave to amend deemed proper to avoid delay and in furtherance of justice].)

Here, the order sustaining the demurrer to each of the four causes of action of the Complaint without leave to amend effectively ended plaintiffs' ability to proceed further with their case below. The only step left to make the order appealable was the formal entry of a dismissal order or judgment. We will accordingly deem the order on the demurrer to incorporate a judgment of dismissal and will review the order. (*Thaler v. Household Finance Corp.*, *supra*, 80 Cal.App.4th at p. 1098.)

III. *Standard of Review*

The standard of review is de novo. (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1152 [2 Cal.Rptr.3d 396].) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see also *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1075 [60 Cal.Rptr.2d 263, 929 P.2d 582].)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213 [197 Cal.Rptr. 783, 673 P.2d 660].) Thus, as noted, in considering the merits of a demurrer, "the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.]" (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [176 Cal.Rptr. 824]; see also *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216] [court reviewing propriety of ruling on demurrer is not concerned with the "plaintiff's ability to prove . . . allegations, or the possible difficulty in making such proof"].)

On appeal, we will affirm a "trial court's decision to sustain the demurrer [if it] was correct on any theory. [Citation.]" (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808 [50 Cal.Rptr.2d 736], fn. omitted.) Thus, "we do not review the validity of the trial court's reasoning but only the propriety of the ruling itself. [Citations.]" (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757 [62 Cal.Rptr.2d 778].)

When a demurrer is sustained without leave to amend, the reviewing court must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, it will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. (*Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 719 [17 Cal.Rptr.3d 374].) The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 [25 Cal.Rptr.3d 320, 106 P.3d 976].)

### IV. *Claim Under Health and Safety Code Section 1597.40*

#### A. *Contentions of the Parties*

Sisemore alleges in the first cause of action of her Complaint that Master Financial's conduct in rejecting her loan application constituted a practice of discrimination against family daycare home providers in violation of Health and Safety Code section 1597.40. Specifically, Master Financial violated that statute when it (1) refused to lend to her if she operated her family daycare business in the home she was acquiring through the anticipated loan; (2) issued "a written instrument . . . publishing [Master Financial's] stated policy of refusing to make home loans secured by a dwelling in which a licensed home day care is operated"; and (3) discriminated against other loan applicants who were home daycare operators.

Sisemore urges that Master Financial's conduct was a violation of subdivision (b) of Health and Safety Code section 1597.40 because Master Financial's letter refusing to make a loan to a family daycare home constituted a "written instrument . . . forbid[ding] or restrict[ing] the . . . mortgaging of [] real property for use or occupancy as a family day care home." She contends that the trial court erroneously held that no such claim was alleged because Master Financial's written denial "[did] not purport to restrict any real property from being used or occupied as a family day care home." (Boldface omitted.)

Sisemore argues further that she stated a cause of action for a violation of Health and Safety Code section 1597.40, subdivision (c). She urges that Master Financial's denial of a loan was a "restriction or prohibition . . . [on] the acquisition, use, or occupancy of [] property for a family day care home for children," proscribed by Health and Safety Code section 1597.40, subdivision (c). Sisemore argues that the court below erred by concluding that Master Financial's alleged conduct "[did] not violate subdivision (c) because it [did] not impose restrictions on the purchase and use of real property." She argues further that the court erred when it found that "[s]ubdivision[s] [(b) and] (c) do[] not require mortgage lenders to engage in the business of lending on day care homes."

Master Financial responds that the statute does not apply to the matters alleged by Sisemore. Specifically, Health and Safety Code section 1597.40 concerns the invalidity of written instruments or restrictive covenants impairing the use of real property for the operation of family daycare homes. Since Sisemore—Master Financial argues—did not allege the existence of such a written instrument or restrictive covenant, she failed to state a cause of action under the statute.

## B. *Viability of First Cause of Action*

### 1. *Health and Safety Code section 1597.40, subdivision (b)*

Health and Safety Code section 1597.40, subdivision (b) provides: "Every provision in a written instrument entered into relating to real property which purports to forbid or restrict the conveyance, encumbrance, leasing, or mortgaging of the real property for use or occupancy as a family day care home for children, is void and every restriction or prohibition in any such written instrument as to the use or occupancy of the property as a family day

care home for children is void." As noted, Sisemore contends that Master Financial's letter denying Sisemore's loan application constituted a "written instrument" restricting or prohibiting the mortgaging of Sisemore's property for use or occupancy as home daycare, in violation of subdivision (b) of the statute. Reduced to its most basic form, Sisemore's contention is that a rejection letter in which a mortgage lender refuses to make a loan where the security is intended to be used as a family daycare home constitutes a "written instrument." We reject that assertion.

■ In construing subdivision (b) of Health and Safety Code section 1597.40, we begin "with the actual language of the statute, and if the text is clear as applied to a given case, and it does not fall into any of the exceptions, stop there. [Citations.]" (*J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1575 [33 Cal.Rptr.2d 206].) We thus commence by considering whether Master Financial's rejection letter constituted a "written instrument" under the statute. Health and Safety Code section 1597.40, subdivision (b) does not define the term, and there have been no reported decisions discussing the meaning of "written instrument" in subdivision (b). But in context, the type of "written instrument" addressed in subdivision (b) of the statute is one "entered into relating to real property" and which contains certain restrictions or prohibitions concerning the use of the property.

We are guided by the manner in which "instrument" is defined under the Government Code with reference to the recordation of documents: " 'Instrument,' as used in this chapter, means a written paper signed by a person or persons transferring the title to, or giving a lien on real property, or giving a right to a debt or duty." (§ 27279, subd. (a).) And we note that a leading authority, in identifying a nonexclusive list of 116 types of written instruments subject to recordation under section 27280, subdivision (a),[6] does not include a mortgage lender rejection letter as being a recordable instrument. (5 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 11:6, pp. 19–35.)

As defined in legal dictionaries, the term is not susceptible of the meaning ascribed to it by Sisemore. (See, e.g., Black's Law Dict. (8th ed. 2004) p. 813, col. 2: "**instrument. 1.** A written legal document that defines rights, duties, entitlements, or liabilities, such as a contract, will, promissory note, or share certificate.") Nor are common definitions of "instrument" supportive of Sisemore's position. (See, e.g., Webster's Third New Internat. Dict. (1993)

---

[6] "Any instrument or judgment affecting the title to or possession of real property may be recorded pursuant to this chapter." (§ 27280, subd. (a).)

p. 1172, cols. 1–2: "**instrument** . . . a legal document (as a deed, will, bond, lease, agreement, mortgage, note, power of attorney, ticket on carrier, bill of lading, insurance policy, warrant, writ) evidencing legal rights or duties esp. of one party to another . . ."; Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 605, col. 2: "**instrument** . . . a formal legal document (as a deed, bond, or agreement) . . . .")

 Sisemore asserts that *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048 [71 Cal.Rptr.2d 899] (*Barrett*) supports a broad construction of the statute and the conclusion that Master Financial's rejection letter constituted a "written instrument." The chief issue in *Barrett* was whether a 1983 amendment to Health and Safety Code section 1597.40 (formerly codified as § 1597.501) was intended to make restrictive covenants that limited family daycare homes in residential areas void irrespective of whether the covenants predated the original enactment of the statute in 1981. Significantly, *Barrett*—unlike the case here—clearly concerned a written instrument; namely, a restrictive covenant contained in a document recorded when the neighborhood was developed in 1968. (*Barrett, supra,* at p. 1052.) *Barrett* simply does not support the conclusion that a mortgage lender's letter rejecting a borrower based upon the anticipated use of the security as a family daycare home constitutes a "written instrument" under Health and Safety Code section 1597.40, subdivision (b).

"Words used in a statute or constitutional provision should be given the meaning they bear in ordinary use. [Citations.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) In this instance, we cannot reasonably construe Master Financial's letter rejecting a mortgage loan based upon the nature of Sisemore's anticipated use of the security to be a "written instrument" under subdivision (b) of Health and Safety Code section 1597.40.

### 2. *Health and Safety Code section 1597.40, subdivision (c)*

Health and Safety Code section 1597.40, subdivision (c) provides: "Except as provided in subdivision (d) [concerning family home daycare operated in rented or leased property], every restriction or prohibition entered into, whether by way of covenant, condition upon use or occupancy, or upon transfer of title to real property, which restricts or prohibits directly, or indirectly limits, the acquisition, use, or occupancy of such property for a family day care home for children is void." Sisemore contends—independent of her claim under Health and Safety Code section 1597.40, subdivision (b)—that Master Financial violated subdivision (c) because it restricted or prohibited Sisemore from using the property she intended to acquire as a family daycare home. She argues that subdivision (c) affords broad protection

against practices that directly or indirectly limit, inter alia, the use of property for family daycare, including Master Financial's practice here.

█ We first reject Master Financial's argument that no claim under subdivision (c) was stated because its rejection letter did not constitute a "written instrument." While, as we have observed, this contention has merit under subdivision (b) of Health and Safety Code section 1597.40, nowhere is the term "written instrument" found in subdivision (c). There is no reason to import the requirement of a "written instrument" specified in subdivision (b) into the practices proscribed under subdivision (c).

Sisemore posits correctly that the scope of Health and Safety Code section 1597.40, subdivision (c) is broader than subdivision (b), in that the former subdivision does not require a "written instrument" as its subject. By its terms, subdivision (c) embraces "every restriction or prohibition entered into," irrespective of whether it is part of a "written instrument." Were we to interpret subdivision (c)—as suggested by Master Financial—to apply only to restrictions or prohibitions found in a "written instrument," the proscriptions in subdivision (b) would be rendered unnecessary and surplusage. (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081] [rejecting interpretation of statute that would render other existing provisions unnecessary].)

But we do not believe that Health and Safety Code section 1597.40, subdivision (c) encompasses the type of conduct here, i.e., a mortgage lender's rejection letter. The statute addresses restrictions or prohibitions "entered into," thereby implying an arrangement more formal and binding than simply a lender's stated policy regarding mortgage loans. (See Black's Law Dict., *supra*, p. 572, col. 2: "**enter.** . . . **3.** To become a party to <they entered into an agreement>.") The express intent of the Legislature in enacting Health and Safety Code section 1597.40 was that "family day care homes for children should be situated in normal residential surroundings so as to give children the home environment which is conducive to healthy and safe development." (Health & Saf. Code, § 1597.40, subd. (a).) The Legislature declared "this policy to be of statewide concern with the purpose of occupying the field to the exclusion of municipal zoning, building and fire codes and regulations governing the use or occupancy of family day care homes for children, . . . and to prohibit any restrictions relating to the use of single-family residences for family day care homes for children except as provided by this chapter." (*Id.*, 2d par.) And the court in *Barrett, supra*, 61 Cal.App.4th at pages 1050–1051, identified the scope of the statute as declaring void any restrictive covenants that limited family daycare homes in residential neighborhoods. (See also Note, *Family Day-Care Homes: Local Barriers Demonstrate Needed Change* (1985) 25 Santa Clara L.Rev. 481, 501

["Only recently have a few progressive states, such as California [citing Health & Saf. Code, § 1597.40], specifically prohibited the application of deed restrictions or other written instruments respecting real property, to day-care homes." (Fn. omitted.)].)

We reject Sisemore's construction of Health and Safety Code section 1597.40, subdivision (c), namely, that the statute applies because Master Financial "entered into" a rejection letter that restricted or prohibited the use to which security for a proposed loan could be made. The mortgage lending policy contained in that letter did not constitute a "restriction or prohibition entered into, whether by way of covenant, condition upon use or occupancy, or upon transfer of title to real property, which restricts or prohibits directly, or indirectly limits, the acquisition, use, or occupancy of such property for a family day care home . . . . " (Health & Saf. Code, § 1597.40, subd. (c).)

The first cause of action, therefore, failed to state a claim for relief.[7] As there is no reasonable probability that the Complaint could have been amended to state a claim under Health and Safety Code section 1597.40, the trial court properly sustained the demurrer without leave to amend as to that claim. (*Williams v. Housing Authority of Los Angeles, supra,* 121 Cal.App.4th at p. 719.)

### V. *Unruh Civil Rights Act Claim*

#### A. *Background and Contentions of the Parties*

Sisemore alleges in the fourth cause of action of the Complaint that Master Financial's conduct was in violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) (Act). After incorporating by reference all factual allegations in the Complaint, she alleges that Master Financial discriminated against her "based on [her] source of income, occupation, and an arbitrary characteristic, the running of a family day care . . . ."

The court sustained without leave to amend the demurrer to the Act cause of action. It reasoned that "[a] mortgage lender may impose occupational or professional qualifications that exclude certain prospective borrowers. Such restrictions do not constitute arbitrary discrimination unless the mortgage lender uses them as a pretext to exclude persons having the types of personal

---

[7] Since we have concluded that Sisemore failed to state a claim for relief under either subdivision (b) or subdivision (c) of the Health and Safety Code section 1597.40, we need not address Master Financial's further contention that no private right of action for damages may be maintained under the statute. (See *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 655 [4 Cal.Rptr.3d 249] ·[appellate courts generally "decline to decide questions not necessary to the decision"].)

characteristics protected by the [Act]. The election to become a licensed home day care provider represents a professional and, probably, economic choice rather than a personal characteristic of the type enumerated in the Act. . . . See *Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 537 [30 Cal.Rptr.2d 706]." Since Sisemore did not allege that the loan rejection was pretextual in order to discriminate on the basis of a protected personal characteristic, but merely alleged that Master Financial "categorically refuse to approve mortgages for licensed home day care providers," the court concluded that the fourth cause of action failed to state a claim under the Act.

Sisemore asserts that the Act has been construed to afford broad protection against arbitrary discrimination. Discrimination on the basis of one's occupational status is not expressly proscribed by the statute. But our Supreme Court (Sisemore argues) has reiterated that section 51 of the Civil Code does not present an exhaustive list of the bases upon which discrimination is proscribed, and that courts have occasionally recognized other classifications (e.g., children, families with children) that are subject to protection under the Act. Sisemore asserts that occupational-status discrimination, although not expressly mentioned in the statute, is conduct that courts have acknowledged to be prohibited under the Act.

Master Financial responds that subdivision (b) of Civil Code section 51 prohibits only discrimination based upon certain personal characteristics, such as gender, race, color, or religion. It argues that Sisemore is attempting to improperly expand the Act to include protection against discrimination on the basis of an economic, rather than a personal, characteristic. Master Financial, citing *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142 [278 Cal.Rptr. 614, 805 P.2d 873] (*Harris*), contends that economic/financial distinctions, such as the operation of a family daycare home claimed here to be the basis of the discriminatory conduct, are not afforded protection under the Act.[8]

### B. *Whether Unruh Civil Rights Act Claim Was Alleged*

■ Civil Code section 51, subdivision (b) provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex,

---

[8] Master Financial argues further that Sisemore is attempting to base her claim on a disparate impact theory, i.e., that although the alleged discriminatory policy is facially neutral, it has the effect of discriminating against members of a protected class (i.e., women and/or families with small children). (We discuss this disparate impact theory as it may apply to plaintiffs' FEHA claims in Discussion, pt. VI.C., *post.*) Master Financial argues that such a theory is untenable because the Supreme Court has specifically held that the Act prohibits only intentional discrimination and that disparate impact claims are beyond the scope of the statute. (See *Harris, supra,* 52 Cal.3d at pp. 1149, 1175.) But Sisemore concedes that her Act claim is *not* founded on a disparate impact theory. Accordingly, we need not address the issue further.

race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." As our Supreme Court has very recently emphasized: "The Act expresses a state and national policy against discrimination on arbitrary grounds. [Citation.] Its provisions were intended as an active measure that would create and preserve a nondiscriminatory environment in California business establishments by 'banishing' or 'eradicating' arbitrary, invidious discrimination by such establishments. [Citations.]" (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167 [59 Cal.Rptr.3d 142, 158 P.3d 718].)

And the Supreme Court has previously made clear that the listing of the particular bases for discrimination in Civil Code section 51 "is illustrative rather than restrictive. [Citation.]" (*In re Cox* (1970) 3 Cal.3d 205, 216 [90 Cal.Rptr. 24, 474 P.2d 992] (*Cox*).) Thus, in *Cox*, the high court concluded that the Act prohibited a business's arbitrary exclusion of a customer on the ground that he associated with a male with long hair and unconventional dress. (*Cox*, at p. 216.) Similarly, in *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 740 [180 Cal.Rptr. 496, 640 P.2d 115] (*Marina Point*), the court held that a blanket policy of excluding children or families with children from rental housing constituted discrimination under the Act, notwithstanding the fact that those groups were not specifically enumerated in the statute. (See also *O'Connor v. Village Green Owners Assn.* (1983) 33 Cal.3d 790 [191 Cal.Rptr. 320, 662 P.2d 427] (*O'Connor*) [holding that a condominium development restricting residency to persons over 18 violated Act].)

In *Harris, supra,* 52 Cal.3d 1142, the Supreme Court revisited whether discrimination based upon characteristics not specifically enumerated in Civil Code section 51 was potentially proscribed under the Act. After extensive discussion (see *Harris, supra,* at pp. 1154–1156), the court rejected the defendants' position that only classes specifically identified in the statute were protected. The *Harris* court acknowledged that "[b]eginning with *Cox* in 1970, the Unruh Act has been construed to apply to several classifications not expressed in the statute. [Citations.]" (*Id.* at p. 1155.) It therefore rejected the defendants' contention that the Legislature had repudiated the holdings in "*Cox, Marina Point, O'Connor,* and similar appellate decisions extending the Unruh Act beyond its specified categories of discrimination . . . ." (*Id.* at p. 1156.)

The Supreme Court, in *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 840 [31 Cal.Rptr.3d 565, 115 P.3d 1212] (*Koebke*), reiterated that in *Harris* it had "affirmed the principle articulated in [its] earlier decisions that the Act's enumerated categories are illustrative, rather than

restrictive." It explained that *Harris* had established a "a three-part analytic framework for determining whether a future claim of discrimination, involving a category not enumerated in the statute or added by prior judicial construction, should be cognizable under the Act." (*Ibid.*)

Although the case was not mentioned by the Supreme Court, slightly over a year before *Harris* was decided, the Fourth District Court of Appeal (Division Three) held that a police officer had stated a claim for discrimination under the Act on the basis of his occupational status. In *Long v. Valentino* (1989) 216 Cal.App.3d 1287 [265 Cal.Rptr. 96] (*Long*), the plaintiff, a police officer, attended a public meeting sponsored by the American Civil Liberties Union (ACLU) that concerned police practices. (*Id.* at p. 1291.) After being ejected by an ACLU attorney, the plaintiff brought suit for damages, alleging, inter alia, a claim for unlawful discrimination under the Act. (*Long*, at p. 1293.) The appellate court concluded that the plaintiff had stated a claim under the Act based upon arbitrary occupational-status discrimination, and it rejected the defendants' assertion that speech alone (i.e., words uttered ejecting the plaintiff) was not actionable. The court stated: "[A]n announcement such as 'You can't eat at my diner because you are a lawyer, bricklayer, female, or Indian chief' would be actionable under the Unruh Act, although words alone were the means employed to effect the unlawful discrimination." (*Long*, at p. 1297; see also *McCalden v. California Library Ass'n* (9th Cir. 1990) 955 F.2d 1214, 1221 [noting that protected classes under the Act have been broadly defined to include, inter alia, "students, families with children, welfare recipients, and occupational groups"].) Moreover, the court disposed of the defendants' argument that police officers were not entitled to protection under the Act, holding that "they are as much entitled to the protections of the Unruh Act as any other citizen. They may not be refused service in a restaurant, denied an apartment, or ejected from a public meeting merely because of their occupation, whether working a shift or on vacation." (*Long, supra*, at p. 1298; see also *id.* at p. 1300 [citing other hypothetical examples of prohibited occupational-status discrimination by car rental agency, restaurateur, and transportation company].)

Sisemore urges that *Long* established a judicially recognized category (occupational status) that is protected from arbitrary discrimination under the Act. She argues that since the Supreme Court in *Harris, supra,* 52 Cal.3d 1142 did not disturb prior case authority identifying certain protected classifications not specified in Civil Code section 51, she stated a viable cause of action under *Long* for occupational-status discrimination.

 We conclude that Sisemore has alleged a cognizable Unruh Civil Rights Act claim. At its most basic form, the fourth cause of action alleges that Master Financial arbitrarily discriminated against Sisemore solely on the

basis of her occupational status. Liberally construed, the claim is that she was refused a mortgage loan simply because she is a family daycare home operator. *Long, supra,* 216 Cal.App.3d 1287 supports the conclusion that arbitrary occupational discrimination is prohibited under the Act. (See also 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 905, pp. 388–389 [identifying occupational discrimination as being protected under Act, citing *Long*].) The Supreme Court has not overruled or even questioned *Long*'s holding. In addition, we note that seven years before *Long* was decided, the Supreme Court in dictum mentioned that discrimination on the basis of employment status was a cognizable claim under the Act. (*Marina Point, supra,* 30 Cal.3d at p. 736; see also 58 Ops.Cal.Atty.Gen. 608 (1975) [concluding that arbitrary occupational discrimination was prohibited by Act].)[9] The high court has never repudiated that dictum. Therefore, Sisemore has stated a discrimination claim under the Act.[10]

Master Financial urges that it simply made a business decision that it would make no loans to a prospective borrower who intended to use the security for the loan (his or her residence) to operate a family daycare business. It alternatively characterizes its conduct as a refusal to make a business loan. While these are potential explanations for its actions, the fact remains that the Complaint alleges that Master Financial refused to provide a mortgage loan to Sisemore—who was otherwise qualified for the loan under Master Financial's criteria—because she intended to engage in her chosen occupation as a family daycare home operator. She is required by statute to use her residence to operate a family home daycare facility. (See Health & Saf. Code, § 1596.78 [defining facility as home regularly providing child care to 14 or fewer children "in the provider's own home"].) Sisemore therefore must use the security for her mortgage loan (her home) to engage in

---

[9] " 'Opinions of the Attorney General, while not binding, are entitled to great weight. [Citations.] In the absence of controlling authority, these opinions are persuasive "since the Legislature is presumed to be cognizant of that construction of the statute." ' [Citation.]" (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].)

[10] Master Financial does not contest the fact that, assuming discriminatory conduct under the Act, the activity of making mortgage loans would constitute "accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever" within the ambit of Civil Code section 51, subdivision (b). The Supreme Court has held consistently that the Legislature's use of " 'the words "all" and "of every kind whatsoever" in referring to business establishments covered by the Act (Civ. Code, § 51), and the inclusion of these words without any exception and without specification of particular kinds of enterprises, leave no doubt that the term "business establishments" was used in the broadest sense reasonably possible.'. . . [Citation.]" (*O'Connor, supra,* 33 Cal.3d at p. 795.) There is no question that Master Financial's lending business constituted a "business establishment" and that Sisemore's alleged denial of a mortgage loan was a denial of an "accommodation[], facilit[y], privilege[], or service[]" under the Act. (See *Jackson v. Superior Court* (1994) 30 Cal.App.4th 936, 940–941 [36 Cal.Rptr.2d 207] [applying Act to bank allegedly denying services on the basis of race].)

her chosen occupation. Regardless of the label used to describe Master Financial's alleged conduct, it can fairly be considered as a refusal to deal with Sisemore solely on the basis of her occupation.

■ Master Financial, citing *Harris*, also argues that the type of discrimination alleged by Sisemore is "entirely economic," rather than discrimination based upon a "personal" characteristic protected under the Act. This position is without merit for two reasons. First, we do not read *Harris* as establishing a bright-line test in which discriminatory conduct is proscribed under the Act only if it involves a "personal" characteristic. Rather, the court held that the Act provides protection against discriminatory conduct based upon categories identified in the statute as well as others that have been identified in appellate decisions. (*Harris, supra*, 52 Cal.3d at p. 1155.)[11] The *Harris* court further held that, in evaluating the viability of an Unruh Civil Rights Act claim based upon a category not enumerated in the statute *or identified in a prior appellate decision*, one of the questions in the three-part test is whether the new claim "is based on a classification that involves personal characteristics." (*Koebke, supra*, 36 Cal.4th at p. 841.) Since *Long, supra*, 216 Cal.App.3d 1287, held that the Act prohibited arbitrary discrimination on the basis of one's occupation, we need not engage in the three-part *Harris* test that would require a qualitative analysis of whether a person's occupation is a "personal" characteristic, or a purely "economic" one.

Second, even were such an analysis required, we would disagree with Master Financial that one's occupational status is a purely economic characteristic. This case differs significantly from the circumstances in *Harris*, where the claim was that a business could not discriminate under the Act by establishing a particular economic criterion for the rental of an apartment unit. Here, Sisemore contends that she was discriminated against because of her choice of occupations, *not* that she was denied a mortgage loan because that choice resulted in her earning insufficient income to meet the lender's underwriting criteria. Moreover, an individual's choice of an occupation—while it may, of course, be motivated at least in part by economic considerations—is often a very personal one.

Master Financial relies on *Roth v. Rhodes, supra*, 25 Cal.App.4th 530, in support of its position that Sisemore did not allege a viable Act claim. In

---

[11] To be sure, the Supreme Court noted the judicially recognized additional categories as having been "based on personal characteristics of individuals that bore little or no relationship to their abilities to be responsible consumers of public accommodations." (*Harris, supra*, 52 Cal.3d at p. 1148.) But the Supreme Court did *not* hold that the additional categories recognized in prior decisions would continue to receive protection under the Act only if they possessed strictly "personal" characteristics. And, as we have noted, the court did not overrule the holding in *Long, supra*, 216 Cal.App.3d 1287, that the Act prohibits arbitrary occupational-status discrimination.

*Roth*, the plaintiff, a podiatrist, alleged that operators of medical buildings had, inter alia, violated the Act by limiting its commercial tenants to medical doctors. (25 Cal.App.4th at pp. 535–536.) The trial court granted summary adjudication in favor of the defendants on the Act claim. (25 Cal.4th at p. 536.) The *Roth* court posited that the question of whether a commercial landlord could "refuse to lease space to podiatrists [was] analytically no different from the question of whether the law requires a department store which caters to the high end of the market to purchase shoes from a manufacturer who makes less expensive, lower quality shoes. Or we could ask, does the law prohibit a landlord from limiting his tenancies to lawyers, merchants, or any specific trade or profession?" (*Id.* at pp. 536–537.) The court concluded that restrictions by a commercial landlord limiting tenants to certain occupations do not run afoul of the Act as long as the restrictions are not used as a pretext to exclude persons having personal characteristics protected under the Act. (25 Cal.App.4th at p. 537.) In so holding, the court noted that the choice of a profession is "a professional and, frequently, an economic choice, rather than a personal characteristic of the type enumerated in the [A]ct." (*Id.* at p. 539.)

While a cursory reading of *Roth* might suggest that Sisemore's occupational status is not protected under the Act against arbitrary discrimination of the kind alleged here, we conclude that *Roth* dictates no such conclusion. *Roth* concerned a commercial landlord's decision to tailor its tenant base to a particular occupation to the exclusion of all others. This business decision provided a uniform tenancy for the commercial building, rather than an arbitrary exclusion of one particular occupational group.

Further, the procedural posture in *Roth* differs greatly from the status of our case. The trial court in *Roth* granted summary adjudication after receiving evidence concerning the defendants' business justification for the allegedly discriminatory practice. Here, the court rejected the claim at the demurrer stage, without any evidence of Master Financial's justification for refusing to make a mortgage loan to Sisemore because of her occupation. On the face of the pleadings, Master Financial arbitrarily rejected Sisemore as a borrower solely because of her occupation even though she otherwise met the lender's qualifications. At this stage, it was improper for the court to have found that Sisemore had not stated a viable claim under the Act.

█ Moreover, *Roth* did not repudiate the holding in *Long, supra*, 216 Cal.App.3d 1287, that the Act prohibits arbitrary occupational discrimination. Indeed, the *Roth* court neither cited *Long* nor held categorically that the Act does not protect against any form of occupational-status discrimination. (See *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 118 [33 Cal.Rptr.3d 46, 117 P.3d 660] [" 'Language used in any opinion is of course to be understood

in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered' "].) We therefore conclude that *Roth* is distinguishable from the circumstances before us and does not compel the conclusion that Sisemore has failed to state a claim under the Act.

■■■ " 'The purpose [of the Act] is to compel a recognition of the equality of citizens in the right to the peculiar service offered . . .' " by an organization or entity covered by the Act. (*Marina Point, supra,* 30 Cal.3d at p. 738; see also *Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 733 [195 Cal.Rptr. 325].) As the Supreme Court has held, "[t]he Act is to be given a liberal construction with a view to effectuating its purposes. [Citations.]" (*Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 28 [219 Cal.Rptr. 133, 707 P.2d 195]; see also *Angelucci v. Century Supper Club, supra,* 41 Cal.4th at p. 167.) We conclude that a finding here that Sisemore stated a viable Unruh Civil Rights Act claim for occupational discrimination is consistent both with the holding in *Long* and the statute's policy of prohibiting arbitrary denial of access to public accommodations.

## VI. *FEHA Claims*

### A. *Background*

In the third cause of action, plaintiffs allege that Master Financial committed unlawful housing practices in violation of FEHA. They assert that Master Financial, as a ". . . mortgage company or other financial institution that provides financial assistance for the purchase, organization, or construction of any housing accommodation[,] . . . discriminate[d] against [a] person or group of persons because of the . . . sex, . . . familial status, . . . [or] source of income . . . in the terms, conditions, or privileges relating to the obtaining or use of that financial assistance." (§ 12955, subd. (e).)

There are two essential components to plaintiffs' position. First, they assert that they properly alleged a claim for intentional discrimination against a group specifically protected under FEHA—namely, persons discriminated against based on the source of their income in violation of subdivision (e) of section 12955. Second, plaintiffs contend that they alleged a prima facie case of disparate impact discrimination in violation of subdivision (e) of section 12955 because Master Financial's policy of not lending to home daycare operators disproportionately affected two protected classes, namely, women and families with children. Since a FEHA violation may be shown (as provided in section 12955.8, subdivision (b)) by establishing that an act prohibited by FEHA "has the effect, regardless of intent, of unlawfully discriminating on the basis of . . . sex . . . [or] familial status . . . ," plaintiffs contend that they stated a viable disparate impact claim.

The court below concluded that neither plaintiff had alleged a viable FEHA claim. It concluded that the "source of income" category in section 12955, when the statute is "viewed as a whole and in conjunction with its legislative history, . . . [applies only to] prohibit[] discrimination on the basis of a person's source of income in assessing his or her eligibility for rental housing. It does not prohibit discrimination on the basis of a person's source of income in assessing his or her eligibility for a mortgage loan." The court held further that plaintiffs' disparate impact claim failed because the allegations did not "establish that the alleged discriminatory practices affect women as a group or families with children as a group. Instead, they establish that the discriminatory practices affect licensed home day care providers as a group. The FEHA does not protect this group."

We address separately below plaintiffs' intentional discrimination and disparate impact theories. We also address Master Financial's assertion that the order sustaining the demurrer was proper (as to the entity plaintiff) on the additional ground that Project Sentinel lacks standing to assert a FEHA claim.

### B. *Plaintiffs' Intentional Discrimination Claims under FEHA*

Section 12955 makes a variety of discriminatory housing practices unlawful. Subdivision (e) of the statute—upon which plaintiffs' intentional discrimination claims are based—makes it unlawful "[f]or any person, bank, mortgage company or other financial institution that provides financial assistance for the purchase, organization, or construction of any housing accommodation to discriminate against any person or group of persons because of the race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, *source of income*, or disability in the terms, conditions, or privileges relating to the obtaining or use of that financial assistance." (Italics added.) Based upon Master Financial's statements—(to Sisemore) that it "does not lend on day care homes," and (to Project Sentinel) that it "will NOT make loans with home day care if the home day care income is required to qualify"—plaintiffs contend that they were denied a mortgage loan on the basis of source of income as proscribed by section 12955, subdivision (e).

Master Financial's primary response is that the terms of section 12955 make it clear that the source-of-income discrimination provisions apply only in the context of discrimination by a landlord against an actual or potential tenant seeking rental housing. In support of this position, it cites subdivision (p)(1) of the statute, which provides: "For the purposes of this section, 'source of income' means lawful, verifiable income paid directly to a tenant or paid to a representative of a tenant. For the purposes of this section, a landlord is not considered a representative of a tenant." Master Financial

argues further that the legislative history of the 1999 amendment to section 12955 compels the conclusion that the source-of-income provisions protect only tenants or prospective tenants against discrimination by landlords.

The interpretation and application of a statute involve questions of law subject to de novo review. (*Amdahl Corp. v. County of Santa Clara* (2004) 116 Cal.App.4th 604, 611 [10 Cal.Rptr.3d 486].) We take a three-step sequential approach to interpreting statutory language. (See *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238–1239 [8 Cal.Rptr.2d 298] (*Halbert's Lumber*).) First, we will examine the language at issue, giving "the words of the statute their ordinary, everyday meaning." (*Id.* at p. 1238; see also *Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735.) If we conclude that the statutory meaning is free of doubt, uncertainty, or ambiguity, the language of the statute controls, and our task is completed. (*Halbert's Lumber, supra,* at p. 1239; see also *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998 [275 Cal.Rptr. 201, 800 P.2d 557].) Second, if we determine that the language is unclear, we will attempt to determine the Legislature's intent as an aid to statutory construction. (*Halbert's Lumber, supra,* at p. 1239.) In attempting to ascertain that intent, "we must examine the legislative history and statutory context of the act under scrutiny. [Citations.]" (*Sand v. Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].) Third, if the clear meaning of the statutory language is not evident after attempting to ascertain its ordinary meaning or its meaning as derived from legislative intent, we will "apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], . . . practical [citations], in accord with common sense and justice, and to avoid an absurd result [citations]." (*Halbert's Lumber, supra,* at pp. 1239–1240.)

We will conform to this three-step procedure in our interpretation of the statutory language at issue here.

### 1. *Whether language is clear on its face*

On its face, the language of subdivision (e) of section 12955—prohibiting discrimination against "any person or group of persons" on the basis of source of income—appears clear on its face. "Person" is not limited in any way; in its ordinary sense, the language would suggest universal application to any man, woman, or child who is subjected to discrimination on the basis of his or her source of income in connection with the financing of the purchase, construction, or organization of housing.

But subdivision (p)(1) of section 12955 undermines the supposedly clear meaning of "any person or group of persons" in subdivision (e). While the definition of "source of income" found in subdivision (p)(1) does not compel the conclusion that subdivision (e) prohibits source-of-income discrimination only in the context of persons seeking rental housing, the collision of these two subdivisions creates an ambiguity unresolved by the first step of statutory construction.

Accordingly, we will attempt to ascertain the meaning of the statute by examining legislative intent.

## 2. *Legislative intent*

Master Financial in its demurrer contended that the Legislature's clear intent was to make the provisions concerning source of income discrimination applicable only in the landlord-tenant context. It cited certain language purportedly describing the purpose of the bill ultimately enacted in 1999 to amend section 12955.[12] The language, describing a version of Senate Bill No. 1098 (1999–2000 Reg. Sess.) (Senate Bill 1098), reads: "This bill would make it unlawful for a landlord to use specified financial or income standards for the rental of housing. The standard[] would be unlawful if it: a) fails to account for the aggregate income of persons residing together or proposing to reside together, or the aggregate income of the tenants and their co-signers, on the same basis as the aggregate income of married persons residing together or proposing to reside together; or b) uses a minimum income standard based on a multiple or percentage of the rent that, in case where there is a government rent subsidy, fails to calculate the minimum income based solely on the part of the rent to be paid by the tenant." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, p. 3.)[13]

Sisemore correctly notes that the above quoted language related to an early version of Senate Bill 1098; at the time, the proposed legislation did not have "source of income" language as part of an amendment to section 12955. Instead, it proposed the inclusion (as subds. (m) and (n) of § 12955) of language prohibiting the failure to account for certain income of actual or

---

[12] As this was the only language quoted by Master Financial in its demurrer, it is apparent that this was the legislative history upon which the court based its conclusion that subdivision (e) of section 12955 applied only to source-of-income discrimination in connection with determining a person's eligibility for rental housing.

[13] In its appellate brief, Master Financial does not repeat this language or renew the argument that this particular language compels the conclusion that the legislative intent was to limit source-of-income discrimination under section 12955 to actions taken against persons seeking rental housing.

prospective tenants as. outlined in the language quoted in the preceding paragraph. The proposed legislation was amended in July 1999, at which time appeared the "source of income" language that ultimately became part of the 1999 amendment to section 12955. Therefore, we conclude that the language cited by Master Financial in its demurrer does not support the conclusion that the legislative intent was to limit the class of persons protected against source-of-income discrimination to actual or prospective tenants seeking rental housing.

Master Financial also asserts that a heading to and introductory language concerning Senate Bill 1098 support its position regarding legislative intent. Specifically, it cites the following heading and preamble to a committee report for the proposed legislation: "SUBJECT [¶] Landlord and Tenant Law—Rights of Parties upon Termination of Section 8 Contracts—Rental Information and Criteria—[¶] DESCRIPTION [¶] This bill would amend the landlord/tenant laws as follows: . . ." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1098 (1999–2000 Reg. Sess.) as amended Apr. 7, 1999, p. 1.) But as we have noted, this description concerned an early iteration of Senate Bill 1098 that preceded its amendment in which source-of-income language appeared. Further, we find such descriptions in headings to analyses of proposed legislation to have little or no value in ascertaining legislative intent.

Of some significance here in evaluating legislative intent is a portion of the legislative counsel's digest of the final version of Senate Bill 1098: "This bill would, until January 1, 2005, prohibit discrimination under [FEHA] on the basis of a *person's* source of income, the failure to account for the aggregate income of coresidents, or the failure to exclude a government rent subsidy from that portion of the rent to be paid by the *tenant* in assessing his or her eligibility for rental housing." (Legis. Counsel's Dig., Sen. Bill No. 1098 (1999–2000 Reg. Sess.) Stats. 1999, ch. 590, italics added.) The legislative counsel's use of the term "person" in the first clause to describe the class of individuals who would be protected under the bill against source-of-income discrimination—particularly when juxtaposed against the term "tenant" in the second clause-supports plaintiffs' assertion that subdivision (e) of section 12955 was intended to protect all persons, not just tenants or prospective tenants, against source-of-income discrimination. (See *Harris, supra*, 52 Cal.3d at p. 1157, fn. 6 [courts may "ascribe[] to the Legislature the intentions expressed in the Legislative's Counsel's Digest of a statutory amendment"].)

In our effort to ascertain the intent of the Legislature here, we are mindful of the observation of Justice Sills that "reading the tea leaves of legislative history is often no easy matter. Even assuming there is such a thing as

meaningful collective intent, courts can get it wrong when what they have before them is a motley collection of authors' statements, committee reports, internal memoranda and lobbyist letters. . . . In light of these factors, the wisest course is to rely on legislative history only when that history itself is unambiguous." (*J.A. Jones Construction Co. v. Superior Court, supra,* 27 Cal.App.4th at p. 1578.) After consideration of the matter, we believe that it would be imprudent to render a conclusive interpretation of the 1999 amendment to section 12955 on the basis of legislative intent.[14]

### 3. *Application of reason and common sense*

The court below interpreted the "source of income" protections of section 12955 as "prohibit[ing] discrimination on the basis of a person's source of income in assessing his or her eligibility for rental housing" only. It thus restricted the statute to affording protection only to tenants or prospective tenants, and then, only in the context of source-of-income discrimination by a landlord in a lease transaction. In effect, the court held that section 12955, subdivision (p)(1)'s "source of income" definition trumped other subdivisions of the statute that facially provide protection against source-of-income discrimination to *all* persons. We conclude that this was an erroneous interpretation of the statute for several reasons.

First, this narrow interpretation ascribes little significance to the fact that section 12955 appears on its face to provide broad protection against source-of-income discrimination in a variety of housing contexts, and not simply to landlord-tenant situations. It is not only subdivision (e) of section 12955—the subdivision at issue here—that appears to afford broad protection to all persons against source-of-income discrimination. Subdivision (a) of section 12955 makes it unlawful "[f]or the owner of any housing accommodation to discriminate against or harass any person because of [the person's] . . . source of income . . . . " Subdivision (c) of section 12955 prohibits the printing or publication of "any notice, statement, or advertisement, with respect to the sale or rental of a housing accommodation that indicates any preference, limitation, or discrimination based on . . . source of income . . . ." Further, subdivision (i) prohibits one "whose business involves real estate-related transactions [from] discriminat[ing] against any person in making available a transaction, or in the terms and conditions of a transaction, because of . . . source of income . . . ." And subdivision (j) makes it unlawful "[t]o deny a person access to, or membership or participation in, a multiple

---

[14] Part of the difficulty here with "reading the tea leaves of legislative history" is that the 1999 amendment to section 12955 was actually a conglomeration of portions of four separate pieces of legislation, each of which addressed distinct issues. (See Sen. Bill No. 1148 (1999–2000 Reg. Sess.); Sen. Bill 1098; Assem. Bill No. 1670 (1999–2000 Reg. Sess.); Assem. Bill No. 1001 (1999–2000 Reg. Sess.).)

listing service, real estate brokerage organization, or other service because of . . . source of income . . . ." Moreover, apparently broad proscriptions against source-of-income discrimination appear in four other subdivisions of section 12955. (See § 12955, subds. (d), (h), (k), (*l*).)

None of. the nine subdivisions of the statute that make reference to prohibiting source-of-income discrimination, on their face, appears to limit either the class of potential discriminatees to actual or prospective tenants or the proscription to landlord-tenant relationships. The trial court's construction of the statute fails to harmonize—and in fact creates conflict between—the nine subdivisions of section 12955 appearing to provide broad coverage for source-of-income discrimination, on the one hand, and subdivision (p)(1), on the other hand. (See *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 218 [46 Cal.Rptr.3d 73, 138 P.3d 220] [provisions that are related " 'should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with the others' "]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323] ["[S]tatutory. sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible"].)

Second, an interpretation limiting persons protected against source-of-income discrimination under subdivision (e) of section 12955 to tenants or prospective tenants would conflict with our duty to make the language of the statute " 'workable and reasonable.' " (*Regents of University of California v. Superior Court* (1970) 3 Cal.3d 529, 537 [91 Cal.Rptr. 57, 476 P.2d 457], fn. omitted.) Rather than make section 12955, in its entirety, "work," the trial court's construction would result in subdivision (e)—as well as eight other subdivisions—being applied to individual cases in a much more restrictive manner than appears warranted by the statutory language. The across-the-board limitation of source-of-income discriminatees under section 12955 to tenants or prospective tenants is not a construction that makes the statutory language reasonable.

Third, we believe that allowing section 12955, subdivision (p)(1) to effectively trump the nine preceding subdivisions of section 12955 by severely restricting the statute's protections against source-of-income discrimination would *not* be "in accord with common sense and justice." (*Halbert's Lumber, supra,* 6 Cal.App.4th at p. 1239.) FEHA is to be liberally construed. (§ 12933; *Auburn Woods I Homeowners Assn. v. Fair Employment & Housing Com.* (2004) 121 Cal.App.4th 1578, 1590 [18 Cal.Rptr.3d 669] (*Auburn Woods*); see generally· *People ex rel. Dept. of Transportation v. Muller* (1984) 36 Cal.3d 263, 269 [203 Cal.Rptr. 772, 681 P.2d 1340] [remedial statute should be liberally construed to promote its

objectives].) An interpretation of section 12955 limiting the statute's apparently broad source-of-income discrimination protections to landlord-tenant circumstances would indeed be a narrow one.

Fourth, the trial court's construction of the statute does not avoid, but in fact promotes, an absurd result. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122 [29 Cal.Rptr.3d 262, 112 P.3d 647] [a "statute should be interpreted to avoid an absurd result"].) It would make the apparent broad protections against source-of-income discrimination found in nine different subdivisions of section 12955 virtually meaningless. The application of source-of-income discrimination only to tenants or prospective tenants would render nugatory the "source of income" language in various subdivisions of the statute. For example, it is doubtful that section 12955, subdivision (j)—proscribing discrimination in connection with access to, membership in, or participation in, a multiple listing service, a real estate brokerage organization, or other services—would realistically prohibit any source-of-income discrimination if the only potential discriminatees were actual or prospective tenants. More to the point here, it is difficult to imagine that section 12955, subdivision (e) would have any real-world application if its source-of-income discrimination prohibitions to loans made to assist in "the purchase, organization, or construction of any housing accommodation" applied only to tenants.

We therefore conclude that subdivision (p)(1) of section 12955 does not confine the protections afforded to potential discriminatees under section 12955, subdivision (e) to tenants or potential tenants seeking rental housing. Rather, since subdivision (e) prohibits source-of-income discrimination by "any person, bank, mortgage company or other financial institution that provides financial assistance for the purchase, organization, or construction of any housing accommodation," the "source of income" definition in subdivision (p)(1) should be read as having potential application only when the potential discriminatee is a tenant or potential tenant and the potential discrimination arises out of efforts to seek rental housing. In this manner, the apparent broad protections against source-of-income discrimination afforded under subdivision (e) are harmonized with subdivision (p)(1)'s definition of "source of income" in the context of potential tenant discrimination. Moreover, such an interpretation is a liberal construction of FEHA that is in furtherance of its broad objectives to proscribe discrimination in the employment and housing settings.

Plaintiffs have alleged that Master Financial discriminated against them on the basis of their source of income in connection with their efforts to obtain financial assistance to purchase a housing accommodation. They have stated a

viable claim for intentional discrimination under section 12955, subdivision (e). The demurrer to the third cause of action of the Complaint should therefore have been overruled.[15]

### C. *Plaintiffs' Disparate Impact Claims Under FEHA*

#### 1. *Background*

Plaintiffs contend that their respective claims under FEHA are viable under an alternative theory of disparate impact discrimination. They argue that Master Financial's practice of not lending to family daycare home operators, while arguably facially neutral, had a disparate impact on protected classes—gender and familial status. As noted above, the court rejected this contention, concluding that the allegations of the Complaint merely showed "that the discriminatory practices affect licensed home day care providers as a group. The FEHA does not protect this group."

On appeal, plaintiffs argue that a disparate impact theory of discrimination is applicable to FEHA claims. They contend that the Complaint properly alleged both elements of such a theory: (1) the existence of an outwardly neutral policy (i.e., no loans to family daycare home operators); and (2) Master Financial's lending practice, regardless of its intent, had the effect of discriminating on the basis of gender and familial status without a sufficient business justification for that practice. Thus plaintiffs assert, as the policy is alleged to have had a significant adverse or disproportionate effect upon one or more protected classes, the third cause of action states a cognizable disparate impact claim.

Master Financial responds that the lending policy claimed to be discriminatory involved economic rather than personal characteristics. Further, family

---

[15] The conclusion that the Complaint was sufficient to survive demurrer is, of course, not an expression of an opinion regarding the merits of plaintiffs' claims. It may very well be the case that plaintiffs will be unable to establish the discriminatory treatment by Master Financial that they allege. (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 199 [126 Cal.Rptr.2d 908, 57 P.3d 372] [acknowledging that, while complaint stated prima facie case for relief sufficient to survive demurrer, the defendant could raise the same challenges later by motion for judgment on the pleadings or summary judgment].) But on reviewing the propriety of sustaining a demurrer to a complaint without leave to amend, we are not concerned with whether the plaintiff ultimately may be able to prove the allegations in his or her pleading. (*Alcorn v. Anbro Engineering, Inc., supra,* 2 Cal.3d at p. 496; cf. *Scheuer v. Rhodes* (1974) 416 U.S. 232, 236 [40 L.Ed.2d 90, 94 S.Ct. 1683], overruled on other grounds in *Davis v. Scherer* (1984) 468 U.S. 183, 191 [82 L.Ed.2d 139, 104 S.Ct. 3012] ["The issue [on the propriety of dismissing a complaint] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test"].)

daycare home providers are not recognized as a protected class under FEHA; thus, the trial court properly rejected the disparate impact claim. Moreover, Master Financial asserts that FEHA does not prevent lenders from taking business factors into consideration as criteria in deciding whether to make loans; here, it was proper for Master Financial to reject the proposed collateral (real property to be used for family daycare) in determining whether to make a loan.

We address the merits of these contentions below.[16]

### 2. *Viability of disparate impact theory*

As a threshold matter, we consider whether a FEHA housing discrimination claim may be founded on a disparate impact theory.[17] We conclude that this theory is recognized both under the California statute (§ 12955.8, subd. (b)) and under federal decisional authority applicable to FEHA.

A disparate impact theory, as an alternative to a theory of disparate treatment (or intentional discrimination), is recognized in the context of employment discrimination claims under FEHA. (*Carter v. CB Richard Ellis, Inc.* (2004) 122 Cal.App.4th 1313, 1321 [19 Cal.Rptr.3d 519] (*Carter*).) As explained by our Supreme Court: " 'Disparate treatment' is *intentional* discrimination against one or more persons on prohibited grounds. [Citations.] Prohibited discrimination may also be found on a theory of 'disparate impact,' i.e., that regardless of motive, a *facially neutral* employer practice or policy, bearing no manifest relationship to job requirements, *in fact* had a disproportionate adverse effect on members of the protected class. [Citations.]" (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354, fn. 20 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)

The parties have cited no case authority specifically holding that a disparate impact housing discrimination claim may be asserted under FEHA—as opposed to a FEHA employment discrimination claim. But plaintiffs urge that

---

[16] Although we have concluded, *ante,* that the demurrer to the third cause of action should have been overruled because it stated a viable claim for intentional discrimination under FEHA, we address plaintiffs' additional disparate impact theory in order to provide guidance to the trial court because of the likelihood that the issue will be raised again. (See *Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 719 [66 Cal.Rptr.2d 630, 941 P.2d 809]; *Hale v. Morgan* (1978) 22 Cal.3d 388, 405 [149 Cal.Rptr. 375, 584 P.2d 512].)

[17] While Master Financial does not address this issue, we consider it to be a foundational matter essential to our analysis.

section 12955.8 authorizes such a housing discrimination theory: "For purposes of this article,[18] in connection with unlawful practices: [¶] . . . [¶] (b) Proof of a violation causing a discriminatory effect is shown if an act or failure to act that is otherwise covered by this part, and that has the effect, regardless of intent, of unlawfully discriminating on the basis of race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, or ancestry. . . ." While there have been no reported decisions addressing the meaning and application of this statute, section 12955.8, subdivision (b) plainly authorizes a claim for housing discrimination irrespective of intent, where the alleged act or omission has the effect of discriminating on the basis of one's "race, color, religion, sex, sexual orientation, familial status, marital status, disability, national origin, or ancestry."

The legislative history of section 12955.8 supports this conclusion. The Senate Judiciary Committee Report concerning Assembly Bill No. 2244 (1993–1994 Reg. Sess.)—the 1993 legislation that included the enactment of section 12955.8 (see Stats. 1993, ch. 1277, § 7, p. 7517)—makes it plain that the Legislature wished to recognize expressly that discrimination under FEHA could be based upon either disparate treatment or disparate impact. "This bill specifically provides that violation of the FEHA may be established by proving that (a) an act or failure to act demonstrates an intent to discriminate in violation of the FEHA or (b) an act or failure to act has the effect, regardless of intent, of unlawful discrimination. [¶] The federal courts have generally held that violations of federal fair housing laws can be established by proving discriminatory effect. [Citations.] [¶] . . . [¶] Discriminatory effect is demonstrated by application of a 'disparate impact analysis.' This analysis permits a complainant to establish a prima facie case of discrimination by showing that a respondent's practice or policies have an adverse impact on a statutory[ily] protected class (e.g., race, religion, sex, etc.). Once the prima facie case is established, the burden shifts to the respondent to justify the challenged practice or policy. . . ." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2244 (1993–1994 Reg. Sess.) as amended Aug. 24, 1993, p. 10.) The analysis cited several disparate impact cases[19] decided under the federal housing discrimination laws. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2244 (1993–1994 Reg. Sess.) p. 10.) It also noted that FEHA as it existed in 1993 (former section 12955.6) provided that "nothing in it 'shall be construed to abrogate or limit the holding in *Keith v. Volpe*[,] 858 F.2d 467[,] relating to discriminatory effect.['] In that

---

[18] "[T]his article" in section 12955.8 refers to article 2 of chapter 6 of FEHA, commencing with section 12955 and generally pertaining to unlawful housing discrimination practices.

[19] See *Huntington Branch, NAACP v. Town of Huntington* (2d Cir. 1988) 844 F.2d 926, and the following cases we discuss, *post*: *Betsey v. Turtle Creek Associates* (4th Cir. 1984) 736 F.2d 983; *United States v. City of Black Jack, Missouri* (8th Cir. 1974) 508 F.2d 1179; *Keith v. Volpe* (9th Cir. 1988) 858 F.2d 467.

case, . . . the Ninth Circuit upheld the district court's finding that a violation of the [federal housing discrimination laws] had been established by evidence of discriminatory effect." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2244 (1993–1994 Reg. Sess.) p. 11.)[20] The legislative history of section 12955.8 clearly demonstrates the recognition that housing discrimination under FEHA may be established either by disparate treatment or by disparate impact. (See also Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2244 (1993–1994 Reg. Sess.) as amended Apr. 28, 1993.)

 Moreover, even absent this statutory authority, "[t]he Legislature sought to make the FEHA ' "substantially equivalen[t]" ' [citation] to the federal Fair Housing Act and its amendments (42 U.S.C. § 3601 et seq.) . . . ." (*Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 749 [123 Cal.Rptr.2d 1, 50 P.3d 718]; see also *Broadmoor San Clemente Homeowners Assn. v. Nelson* (1994) 25 Cal.App.4th 1, 6–7, 8 [30 Cal.Rptr.2d 316].) Accordingly, "[c]ourts often look to cases construing the FHA, . . . when interpreting FEHA" (*Auburn Woods, supra,* 121 Cal.App.4th at p. 1591), and federal authority plainly authorizes disparate impact housing discrimination claims under the Fair Housing Act (FHA). (See *Betsey v. Turtle Creek Associates, supra,* 736 F.2d 986; *Keith v. Volpe, supra,* 858 F.2d 482.)

To present a prima facie disparate impact case under the federal statute (the FHA), "a plaintiff must show at least that the defendant's actions had a discriminatory effect. [Citations.] Discriminatory effect means that 'the conduct of the defendant actually or predictably results in [prohibited] discrimination. . . . ' [Citation.]" (*Keith v. Volpe, supra,* 858 F.2d at p. 482, quoting *United States v. City of Black Jack, Missouri, supra,* 508 F.2d at pp. 1184–1185.) The plaintiff need not show a discriminatory intent to establish a disparate impact claim under the FHA. (*Pfaff v. U.S. Dept. of Housing* (9th Cir. 1996) 88 F.3d 739, 745–746.) Rather, the essential premise of an FHA disparate impact claim " 'is that some [housing] practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.' [Citations.]" (*Mountain Side Mobile Estates v. Secretary of HUD* (10th Cir. 1995) 56 F.3d 1243, 1250–1251, fn. omitted.)

For example, a facially neutral practice of refusing to rent to a prospective tenant receiving AFDC (Aid to Families with Dependent Children) benefits was nonetheless held to have had a discriminatory effect upon a protected class (families with children) to support a housing discrimination claim under

---

[20] The analysis also cited *Dept. Fair Empl. & Hous. v. Merribrook Apartments* (1988) No. 88-19, FEHC Precedential Decisions 1988–1989 CEB 7, page 1, in which an administrative law judge held that a disparate impact housing discrimination claim could be established under FEHA. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2244 (1993–1994 Reg. Sess.) p. 11.)

the FHA. (*Gilligan v. Jamco Development Corp.* (9th Cir. 1997) 108 F.3d 246.) Similarly, while an all-adult policy for an apartment building may have been facially nondiscriminatory—because, at the time, families with children were not a protected class—a disparate impact claim was held maintainable where it had a disproportionately adverse impact on minority tenants. (*Betsey v. Turtle Creek Associates, supra,* 736 F.2d at p. 988.) Likewise, a municipality's refusal to approve a low to moderate income housing development for tenants displaced by a freeway was held to have had a disproportionate effect under the FHA because two-thirds of the displaced low-income tenants were minorities. (*Keith v. Volpe, supra,* 858 F.2d at p. 484.)

In *Gilligan, Betsey, Keith,* and other disparate impact cases, the challenged policy appears benign because it applies on its face to a group of individuals who are not members of a protected class. But the implementation of that policy has a disproportionate adverse effect upon members of a class that *is* protected. In this instance, the facially neutral practices are the alleged refusal to (1) make loans to daycare homes, and (2) fund mortgage loans where the source of income used to qualify for the loan is the operation of a daycare home. Because of the residency requirements for such facilities (Health & Saf. Code, § 1596.78), these practices effectively constitute the refusal to make loans to family home daycare operators. (Cf. *Nationwide Mut. Ins. Co. v. Cisneros* (6th Cir. 1995) 52 F.3d 1351, 1360 [holding that scope of FHA was broad enough to include "redlining," where discriminatory practice of limiting availability of property insurance directly impacted person's ability to obtain housing].) Plaintiffs have alleged further that this facially neutral policy had a disproportionately negative impact on members of two protected classes—women and families with children, because licensed daycare home providers in Santa Clara County are made up of higher percentages of women and families with children than the percentages of those groups as reflected in the County's general population. Therefore, since plaintiffs have alleged facts in the Complaint "of a violation causing a discriminatory effect" by alleging practices "that [have] the effect, regardless of intent, of unlawfully discriminating on the basis of . . . sex [or] . . . familial status" (§ 12955.8, subd. (b)), they have properly pleaded a disparate impact housing discrimination claim under FEHA.

But the court below reasoned that plaintiffs had failed to state a cause of action because the Complaint alleges only discrimination against licensed home daycare providers, a class that is not protected under FEHA. This rationale for sustaining the demurrer was flawed. As we have noted, the essence of a disparate impact claim is that a challenged policy, while facially neutral (i.e., not evidencing intentional discrimination against a protected class), in practice and effect is discriminatory toward a particular protected class. (*Guz v. Bechtel National, Inc., supra,* 24 Cal.4th at p. 354, fn. 20.)

Thus, the fact that Master Financial's policies, on their face, impacted an unprotected class (i.e., family daycare home operators) does not preclude a disparate impact claim.

Master Financial claims that its challenged policies concern economic matters and do not discriminate (even indirectly) on the basis of personal characteristics. But there is nothing in FEHA that remotely suggests that housing discrimination—either disparate treatment or disparate impact discrimination—does not occur if the act or omission involved economic choices (rather than ones based upon personal characteristics). And the federal statute (the FHA) does not contain a limitation that housing discrimination must be based upon personal characteristics. (See, e.g., *Gilligan v. Jamco Development Corp., supra*, 108 F.3d 246 [challenging policy of excluding prospective tenants with AFDC income]; *National Fair Housing Alli. v. Prudential Ins. Co.* (D.D.C. 2002) 208 F.Supp.2d 46 [challenging homeowners insurer's "redlining" policy as having disparate impact on minorities seeking to purchase homes in certain regions].)

In addition, Master Financial asserts that *Carter, supra*, 122 Cal.App.4th 1313, a case cited by the trial court in its ruling, is controlling. There, the plaintiff alleged that her employer's reorganization demoting administrative managers had a disparate impact on women and persons over 40. (*Id.* at p. 1321.) But she asserted erroneously that "administrative managers were a 'protected group.'" (*Id.* at p. 1322.) The appellate court concluded that the plaintiff had not presented sufficient evidence at trial to support a disparate impact claim because "her data set was incomplete" (*id.* at p. 1325); she had failed to present statistical evidence detailing the percentage of women and persons over 40 in the control group of all employees to compare it with the administrative managers affected by the company policy. (*Id.* at pp. 1325–1326.)

*Carter* is not controlling. First, *Carter* was an employment discrimination case decided after a trial; the appellate court held that the defendant's JNOV (judgment notwithstanding the verdict) motion should have been granted due to the absence of plaintiff's evidentiary showing. (*Carter, supra*, 122 Cal.App.4th at p. 1326.) Here, we examine only whether plaintiffs have pleaded sufficient ultimate facts in support of their disparate impact housing discrimination claim to survive demurrer. Second, in contrast to the circumstances in *Carter*—where the plaintiff made the erroneous assertion "that administrative managers were a 'protected group'" (*id.* at p. 1322)— plaintiffs' disparate impact claim here is not so ill-founded. As noted, plaintiffs do not claim that daycare home operators are a protected class.

Third, plaintiffs here have alleged an adequate foundation for their disparate impact claim. They have asserted that Master Financial's policies disproportionately affected women and families with children because those two protected classes comprise a much higher percentage of daycare home operators in Santa Clara County than the percentages of those groups found generally in the county. (See *Charleston Housing Auth. v. U.S. Dept. of Agric.* (8th Cir. 2005) 419 F.3d 729, 741 [tenants of public housing units slated for demolition established prima facie case that proposed action had disparate impact on minorities]; *Mountain Side Mobile Estates v. Secretary of HUD, supra,* 56 F.3d at p. 1251 [noting that a number of cases determined existence of disparate impact under the FHA "based on statistical evidence regarding the narrowly defined area in question"].) In contrast, the plaintiff in *Carter* failed to present any evidence as to the composition of all employees of the company in order to determine whether the challenged policy in fact had a disparate impact on women and persons over 40. (*Carter, supra,* 122 Cal.App.4th at pp. 1325–1326.) Thus, for all the court in *Carter* knew, the composition of women and persons over 40 in the company's employment roster as a whole was at least equal to the percentages of those groups in the subset (i.e., administrative managers) directly affected by the challenged policy.

■ We therefore hold that section 12955.8, subdivision (b) authorizes a housing discrimination claim where the effect of the alleged practice was to discriminate against a person on the basis of, inter alia, his or her gender or familial status, irrespective of whether that discrimination was intentional. We conclude further that plaintiffs have stated a claim under this statute. Master Financial may ultimately disprove the allegations that its policies had a disparate impact upon women or families with children. It may ultimately defeat plaintiffs' claims by, for example, establishing that its lending policy was justified by business necessity.[21] The allegations, however, are sufficient to sustain a disparate impact claim at this early pleading stage. (See *Construction Protective Services, Inc. v. TIG Specialty Ins. Co., supra,* 29 Cal.4th at p. 199.) The demurrer to the third cause of action should have been overruled because the Complaint adequately stated a disparate impact claim under FEHA.

---

[21] Subdivision (b) of section 12955.8 provides in part: "A business establishment whose action or inaction has an *unintended discriminatory effect shall not be considered to have* committed an unlawful housing practice in violation of this part if the business establishment can establish that the action or inaction is necessary to the operation of the business and effectively carries out the significant business need it is alleged to serve. In cases that do not involve a business establishment, the person whose action or inaction has an unintended discriminatory effect shall not be considered to have committed an unlawful housing practice in violation of this part if the person can establish that the action or inaction is necessary to achieve an important purpose sufficiently compelling to override the discriminatory effect and effectively carries out the purpose it is alleged to serve."

### D. *Project Sentinel's Standing to Sue*

Master Financial contended in its demurrer that Project Sentinel lacked standing to maintain the third cause of action. The court did not specifically rule on this issue, having sustained the demurrer based upon a finding that neither plaintiff had stated a cause of action under FEHA. Master Financial renews this position on appeal.

 FEHA authorizes the filing of suit by "[a]n aggrieved person" to seek relief for a discriminatory housing practice or a breach of a conciliation agreement. (§ 12989.1.) The act defines "aggrieved person" as "includ[ing] any person who claims to have been injured by a discriminatory housing practice or believes that the person will be injured by a discriminatory housing practice that is about to occur." (§ 12927, subd. (g).) FEHA (§ 12927, subd. (f)) further defines "person" by reference to the federal definition of that term under FHA, section 3602(d) of title 42 of the United States Code, which reads: " 'Person' includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11 [bankruptcy], receivers, and fiduciaries."

As we have noted, California courts often refer to federal decisional authority under the FHA in their interpretation of FEHA. (*Auburn Woods, supra*, 121 Cal.App.4th at p. 1591; *Brown v. Smith* (1997) 55 Cal.App.4th 767, 781 [64 Cal.Rptr.2d 301]; *Broadmoor San Clemente Homeowners Assn. v. Nelson, supra*, 25 Cal.App.4th at pp. 6–7.) In *Havens Realty Corp. v. Coleman* (1982) 455 U.S. 363 [71 L.Ed.2d 214, 102 S.Ct. 1114] (*Havens Realty*), the United States Supreme Court held that a nonprofit housing group had standing to bring suit under the FHA for alleged racial discrimination in housing. In so holding, the court held that the organization, by alleging that it had been required to devote significant resources to address the defendant's practices, had claimed injury on its own behalf. (*Havens Realty*, at p. 379.)

In *Walker v. City of Lakewood* (9th Cir. 2001) 272 F.3d 1114, the Ninth Circuit Court of Appeal followed *Havens Realty* in reaching the conclusion that an independent fair housing services provider had standing to bring a claim under the FHA and FEHA. There, the court concluded that the provider had suffered injury in fact to support standing under the FHA, based upon allegations that the city with which it had contracted to provide services had retaliated against it and thwarted its ability to provide fair housing counseling services. (272 F.3d at pp. 1124–1125.) The Ninth Circuit held further that because the fair housing services provider had standing under the federal law, it likewise had standing under FEHA. (272 F.3d at pp. 1125–1126.)

Lastly, Project Sentinel cites a decision of the Fair Employment and Housing Commission. In *Department of Fair Employment and Housing v. Green* (1986) No. 86-07, FEHC Precedential Decisions 1986–1987, CEB 1, page 7, the Commission rejected the argument that a fair housing agency (Council) lacked standing to sue under FEHA. It reasoned: "In *Havens Realty*[, *supra*,] 455 U.S. 363 [102 S.Ct. 1114], the Supreme Court held that a housing group very similar to the Council would have standing to sue under the federal Fair Housing Act of 1968 (42 U.S.C. § 3604) if it could demonstrate that the need to send testers out to check the defendant's rental practices had drained money from the group's counseling and referral programs. We determine that the same rationale confers standing on the Council here, because the evidence amply demonstrates that the Council has suffered the diversion of resources the Department claims. Investigating a complaint of discrimination against respondent diverted resources away from the Council's landlord-tenant counseling and public education activities." (*Department of Fair Employment & Housing v. Green*, at p. 7, fn. omitted.) While this decision is not controlling (*Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1157 [51 Cal.Rptr.2d 700, 913 P.2d 909]), we believe it has significant bearing on our resolution of the standing question here. (See *Auburn Woods*, *supra*, 121 Cal.App.4th at p. 1591 ["Commission's interpretation of FEHA 'is entitled to great respect' "].)

Master Financial cites this court's decision in *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal.App.3d 1377 [271 Cal.Rptr. 99] (*Midpeninsula Citizens*) in support of its contention that Project Sentinel lacks standing. There, a nonprofit corporation involved in eliminating housing discrimination brought suit under the Act to challenge an apartment building's rental policy alleged to have been discriminatory. (*Midpeninsula Citizens*, at p. 1380.) The plaintiff contended that it was an "aggrieved person" under Civil Code section 52. (*Midpeninsula Citizens*, at p. 1382.) It urged us to apply *Havens Realty*, *supra*, 455 U.S. 363, to find standing, a contention that we rejected because *Havens Realty* involved standing under a very different statute (the FHA) in which Congress intended to confer broad standing to sue. (*Midpeninsula Citizens*, *supra*, at pp. 1385–1386.) We concluded that, based upon a focused review of the Act and cases decided under it, the plaintiff did not have standing to sue: "[The] Legislature has specifically conferred standing to sue under the Unruh Act upon the victims of the discriminatory practices and certain designated others, i.e., district or city attorneys or the Attorney General. [Citations.] The California courts have not seen fit to endorse a more expansive interpretation of these standing requirements, and we decline to do so in this case." (*Midpeninsula Citizens*, at p. 1386.)

 *Midpeninsula Citizens* does not compel our conclusion here that Project Sentinel lacks standing. As we noted there: "Standing requirements will vary from statute to statute based upon the intent of the Legislature and the purpose for which the particular statute was enacted." (*Midpeninsula Citizens, supra,* 221 Cal.App.3d at p. 1385.) Our high court has very recently reiterated this very point. (See *Angelucci v. Century Supper Club, supra,* 41 Cal.4th at p. 175.) Here, we address standing as it applies to a FEHA claim, and we are persuaded by *Havens Realty, supra,* 455 U.S. 363, and its progeny that have found the existence of standing under the FHA under circumstances similar to those presented here. Since Project Sentinel has alleged that it has been required to divert scarce resources to address Master Financial's alleged wrongful conduct, we conclude that Project Sentinel is a "person aggrieved" under section 12989.1 and has standing to assert a FEHA claim.

### VII. *Claim Under the UCL*

 Business and Professions Code section 17200 provides: "As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." As our high court has stated, "[t]he Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' [Citation.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545], quoting *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) Included among such practices that may be the basis for a UCL claim are alleged violations of the Unruh Civil Rights Act (*Midpeninsula Citizens, supra,* 221 Cal.App.3d at pp. 1389–1393; *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433, 1440 [257 Cal.Rptr. 151]), and of FEHA (*Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 401 [19 Cal.Rptr.3d 29]; *Herr v. Nestlé U.S.A., Inc.* (2003) 109 Cal.App.4th 779, 789 [135 Cal.Rptr.2d 477]).

Since we have concluded that Sisemore has stated viable claims under the Unruh Civil Rights Act (see Discussion, pt. V., *ante*), and under FEHA (see Discussion, pt. VI., *ante*), it necessarily follows that she has alleged sufficient facts to support a cause of action under the UCL. Accordingly, the demurrer to the second cause of action should have been overruled.

## DISPOSITION

We deem the order sustaining the demurrer to the Complaint without leave to amend to have incorporated a judgment of dismissal; we reverse the judgment. The matter is remanded to the trial court with instructions to vacate its prior order sustaining the demurrer without leave to amend, and to issue a new order (a) overruling the demurrer as to Sisemore's second, third, and fourth causes of action of the second amended complaint, (b) overruling the demurrer to the Project Sentinel's third cause of action, and (c) sustaining without leave to amend the demurrer to Sisemore's first cause of action.

Bamattre-Manoukian, Acting P. J., and McAdams, J., concurred.